IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,            )
                                     )
          Plaintiff,                 )      CR No. 13-253-RWR-1
                                     )
                                     )      Washington, D.C.
        vs.                          )      November 21, 2014
                                     )      2:15 p.m.
RODNEY CLASS,                        )
                                     )
          Defendant.                 )
_____)


TRANSCRIPT OF PLEA HEARING
BEFORE THE HONORABLE RICHARD W. ROBERTS
UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

For the Government:          Jeffrey Pearlman
                             U.S. ATTORNEY'S OFFICE
                             FOR THE DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
                             Washington, D.C. 20530
                             (202) 252-7228
                             jeffrey.pearlman@usdoj.gov




For the Defendant:           Rodney Class
                             P.O. Box 435
                             High Schoals, NC 28077
                             PRO SE




Standby Counsel
for the Defendant:           A.J. Kramer
                             FEDERAL PUBLIC DEFENDER
                             FOR THE DISTRICT OF COLUMBIA
                             625 Indiana Avenue, NW
                             Suite 550
                             Washington, D.C. 20004
                             (202) 208-7500
                             A._J._kramer@fd.org

APPEARANCES CONTINUED:

Pretrial Services:          Vaughn Wilson

Court Reporter:          William P. Zaremba, RMR, CRR
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            U.S. District Court
                            for the District of Columbia
                            333 Constitution Avenue, NW
                            Room 6511
                            Washington, D.C. 20001
                            (202)354-3249
                            WilliamPZaremba@gmail.com

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good afternoon.

 3              (Defendant entered.)

 4              DEPUTY CLERK:  Your Honor, this afternoon this is

 5    the matter of United States versus Rodney Class.  This is

 6    Criminal Record 13-253.

 7              Present for the Government --

 8              MR. KRAMER:  Your Honor, I'm sorry, we're having a

 9    problem.

10              THE COURT:  Mr. Class, are you able to hear me?

11              (Pause)

12              THE COURT:  This is off the record.

13              (Pause)

14              DEPUTY CLERK:  Your Honor, this afternoon is the

15    matter of the United States versus Rodney Class,

16    Criminal Record 13-253.

17              Present for the Government is assistant

18    Jeffrey Pearlman.

19              And Mr. Class is representing as pro se.

20              Also standby counsel, A.J. Kramer.

21              All parties are present, Your Honor.

22              THE COURT:  All right.  Good afternoon.

23              MR. KRAMER:  Good afternoon.

24              THE COURT:  Mr. Class, can you hear me?

25              THE DEFENDANT:  (Indicates thumbs up.)
```

1          THE COURT:  Thank you.  Your finger is up.

2          If at any time you cannot hear me or anyone else

3     speaking, I'd ask you to continue to let us know in some

4     way, give us a signal.  Will you do that?

5          THE DEFENDANT:  Yeah.

6          THE COURT:  All right.

7          I understand, Mr. Class, that you are proposing to

8     enter a plea of guilty; is that correct?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Let me invite you forward to the

11    podium with your standby counsel.

12         And before we proceed any further, I'll ask

13    Mr. Smith to administer the oath to you.

14         DEPUTY CLERK:  Mr. Class, would you raise your

15    right hand to be sworn.

16         (Defendant is placed under oath.)

17         THE DEFENDANT:  Yes.

18         DEPUTY CLERK:  Thank you.

19         THE COURT:  Good afternoon, Mr. Class.

20         THE DEFENDANT:  Hello.

21         THE COURT:  You're now under oath.  If you do not

22    answer any of my questions truthfully, you could be

23    prosecuted for perjury or for making a false statement.

24    Do you understand that?

25         THE DEFENDANT:  Yes.

1          THE COURT:  The purpose of this hearing is for you

2    to make a decision whether you want to go to trial on the

3    charge against you or whether you want to enter a plea of

4    guilty to that charge.

5          In order to make such an important decision, it's

6    vital that you understand everything that's going on and

7    everything that I will be explaining to you.

8          So if you do not understand something, please let

9    me know that and I will try to explain it to you in a

10   clearer fashion, or I will let you stand and talk with your

11   standby counsel at any time about what we are discussing.

12         So will you promise to let me know if there's

13   anything that you do not understand?

14         THE DEFENDANT:  Yep.

15         THE COURT:  How old are you now, sir?

16         THE DEFENDANT:  61.  I just turned 61 yesterday.

17         THE COURT:  Belated happy birthday.

18         Can you read and write?

19         THE DEFENDANT:  Yes.

20         THE COURT:  How far did you go in school?

21         THE DEFENDANT:  12th grade.

22         THE COURT:  And where were you born?

23         THE DEFENDANT:  Dover, Ohio.

24         THE COURT:  Have you taken any alcohol or drugs in

25   the last 48 hours?

1          THE DEFENDANT:  No.  But just medication I take

2   for heart.

3          THE COURT:  And have you taken any of that

4   medicine that might affect your ability to understand what

5   you're doing by proposing to plead guilty?

6          THE DEFENDANT:  No.

7          THE COURT:  Have you ever received any treatment

8   for any type of mental illness or emotional disturbance?

9          THE DEFENDANT:  No.

10          THE COURT:  Have you ever received any treatment

11   for addiction to narcotic drugs of any kind?

12          THE DEFENDANT:  No, I don't do drugs or illegal

13   narcotics.

14          THE COURT:  Have you received a copy of the

15   superseding indictment pending against you that contains the

16   written charge in this case?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Have you read the indictment?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Do you understand the charge?

21          THE DEFENDANT:  Yeah.

22          THE COURT:  Have you fully discussed the charge

23   and this case in general with your standby lawyer?

24          THE DEFENDANT:  Off and on, yeah.

25          THE COURT:  Are you satisfied with the services of

1    your standby lawyer so far?

2              THE DEFENDANT:  Yeah.

3              THE COURT:  Have you had enough time to talk with

4    your standby lawyer about this case?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Have you had enough time to talk with

7    your standby lawyer about the government's plea offer and

8    whether or not you should accept it?

9              THE DEFENDANT:  Yeah.  We talked about it up there

10   at the jail.

11             THE COURT:  The pending superseding indictment

12   charges that on or about May 30th of last year here in D.C.,

13   you did have readily accessible firearms on the Capitol --

14   United States Capitol grounds.

15             If you were to be convicted in a trial with that

16   charge and presented to the jury, the government would carry

17   the burden of proving beyond a reasonable doubt each and

18   every essential element of that charge, which would include,

19   first, that you carried or had readily accessible a firearm,

20   that you did so knowingly, and that you carried or had

21   readily accessible a firearm while you were on the

22   United States Capitol grounds.

23             So, Mr. Class, I'm going to ask the prosecutor to

24   tell you and to tell me what happened in this case, and I

25   want you to listen very carefully to everything that he

 1    says, because when he's finished, I'm going to ask you if

 2    everything that he has said is true and accurate.

 3    If there's anything that he says that's not true or

 4    accurate, I'll want you to tell me that after he's finished.

 5    So will you promise to listen carefully to everything that

 6    he says --

 7                THE DEFENDANT:  Yeah.

 8                THE COURT:  -- and to let me know if there's

 9    anything that he says that's not accurate?

10                THE DEFENDANT:  Yep.

11                THE COURT:  All right.  Thank you.

12                MR. KRAMER:  May I just talk to Mr. Pearlman for

13    one second?

14                THE COURT:  Yes.

15                (Counsel conferred off the record.)

16                MR. KRAMER:  Thank you.

17                THE COURT:  All right.  Mr. Pearlman, what would

18    the government's evidence show if this case went to trial?

19                MR. PEARLMAN:  Your Honor, on May 30th, 2013, at

20    approximately 11:30 a.m., Rodney Class -- I assume Mr. Class

21    can hear me -- parked his Jeep Wrangler in the 200 block of

22    Maryland Avenue, Southwest, Washington, D.C., which is part

23    of the Capitol grounds.

24                An agent of the United States Capitol Police

25    observed that the vehicle lacked authorization to park in

1 that area; and upon further inspection, noticed that there

2 appeared to be a large blade attached to the inside roller

3 bar of the vehicle, and what appeared to the agent at the

4 time to be a gun holster in the driver's side door.

5          Mr. Class returned to the vehicle at approximately

6 1:21 p.m.  At that time, he admitted to having weapons in

7 the vehicle.  The agent obtained a search warrant which was

8 executed after 6:00 p.m.

9          Located inside the vehicle was a large blade

10 attached to the roller bar, what had appeared to be a gun

11 holster in the driver's side door was a knife with a sheath.

12          Located on the passenger seat was an unlocked gray

13 bag containing a 9-millimeter Luger firearm loaded with one

14 round in the chamber, for a total of eight rounds.  Several

15 loaded magazines were located with 35 additional rounds.  A

16 box of 9-millimeter ammunition was also located with 50

17 rounds or 93 total.

18          Located in the passenger area was an unlocked

19 large bag containing a .44 Taurus firearm loaded with one

20 round in the chamber, for a total of seven rounds; an

21 additional 90 rounds of .44 caliber ammunition was also

22 recovered in the bag.

23          Located between the passenger area and the rear of

24 the vehicle was an unlocked bag containing a .44-caliber

25 Henry firearm loaded with one round in the chamber, for a

1    total of 11 rounds.  An additional 55 rounds of .44-caliber

2    ammunition was recovered in the bag.

3            The Court set a trial date of October 27th, 2014.

4    Mr. Class was aware of the trial date but willfully chose

5    not to come to court.

6            THE COURT:  All right.  Thank you.

7            Mr. Class, would you come back up to the podium

8    with your standby counsel.

9            Mr. Class, is what the prosecutor has just said a

10   true and accurate description of what happened in this case?

11           THE DEFENDANT:  Pretty much.

12           THE COURT:  Is it true that on May 30th, 2013, you

13   parked your Jeep Wrangler in the 200 block of Maryland

14   Avenue, Southwest, on Capitol grounds?

15           THE DEFENDANT:  I don't know what street it was

16   in.  I parked in behind the arboretum.

17           THE COURT:  Was it on Maryland Avenue, Southwest?

18   That arboretum?

19           THE DEFENDANT:  Well, I assume so.  I just parked

20   in the parking lot behind the arboretum right there in front

21   of the White House.  I didn't know what street it was.

22           THE COURT:  I want to make sure that we know which

23   arboretum you're talking about.  There's an arboretum that's

24   way out Route 50 in Northeast Washington, D.C., that's huge,

25   with lots of plants and animals and joggers and all kinds of

1    stuff.

2            There's another arboretum that's covered that's

3    right at the base of the United States Capitol building.

4            Are you talking about the arboretum that's at the

5    base of the Capitol building?

6            THE DEFENDANT:  Yes.

7            MR. KRAMER:  Yes, Your Honor.  I think it's

8    actually -- there is an arboretum out on New York Avenue.

9            THE COURT:  New York Avenue, right.

10           MR. KRAMER:  But I think it's actually called the

11   botanical gardens, the one in D.C.

12           THE COURT:  We are not --

13           MR. KRAMER:  The building.

14           The building --

15           THE COURT:  The building at the base of the

16   Capitol?

17           MR. KRAMER:  Yes, is actually called the botanical

18   gardens.

19           THE COURT:  Did you hear what Mr. Kramer just

20   described to me?

21           THE DEFENDANT:  Yeah.

22           THE COURT:  He said it's called the botanical

23   gardens.

24           THE DEFENDANT:  Yeah.

25           THE COURT:  But you were calling it the arboretum.

1            THE DEFENDANT:  Yeah.

2            THE COURT:  But you mean the same building that

3   Mr. Kramer was talking about?

4            THE DEFENDANT:  Yes.

5            THE COURT:  It's enclosed, right?

6            THE DEFENDANT:  Yes.

7            THE COURT:  All right.  And it's at the base of

8   the Capitol building.

9            THE DEFENDANT:  Yes.

10           THE COURT:  All right.  So I guess I'm asking you

11  is it true that on May 30th, 2013, you parked your

12  Jeep Wrangler just outside that arboretum, what you're

13  calling the arboretum, but what we now know to be the

14  botanical gardens?

15           THE DEFENDANT:  Yes.

16           THE COURT:  All right.  And is it true that you

17  knew you had in your vehicle a loaded Luger, a loaded

18  Taurus, and a loaded Henry firearm?

19           THE DEFENDANT:  Yes.  I had a carry permit.

20           THE COURT:  You had a what?

21           THE DEFENDANT:  I had a carry concealed permit.

22           THE COURT:  But you knew you had those weapons

23  inside your Jeep Wrangler?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Now, Mr. Class, I want to explain to

1   you certain rights that you have in this matter, and I want

2   to find out whether you understand those rights.

3          So listen carefully to what I tell you and to the

4   questions that I ask you and be sure and let me know if

5   there's anything that you don't understand.  Will you

6   promise to do that?

7          THE DEFENDANT:  Yep.

8          THE COURT:  And if you need to talk to your

9   standby counsel at any time, I'll let you do that.  So let

10  me know if you want to do that.

11         THE DEFENDANT:  Okay.

12         THE COURT:  And, again, if at any time I'm not

13  speaking loudly or clearly enough, please let me know,

14  because I'll try to accommodate you, okay?

15         THE DEFENDANT:  Okay.

16         THE COURT:  All right.

17         You have a right to be represented by a lawyer at

18  every stage in the case, and, if necessary, to have the

19  Court appoint a lawyer for you.  Do you understand that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  You have a right to maintain your

22  previously entered plea of not guilty to the charge against

23  you.  Do you understand that?

24         THE DEFENDANT:  Yes.

25         THE COURT:  You would have a right to file

1    motions, making legal challenge as to the government's case

2    against you.  For example, you could seek to have the charge

3    dismissed or file a motion to have evidence against you

4    suppressed or thrown out.  Do you understand those things?

5            THE DEFENDANT:  Yeah.  We went through this once

6    before, yes.

7            THE COURT:  All right.  And you have the right to

8    have a jury trial in this case, and that means that 12

9    citizens of the District of Columbia would sit in a

10   courtroom and determine whether you are guilty or not guilty

11   based upon the evidence presented in a courtroom.

12           Do you understand your right to a jury trial?

13           THE DEFENDANT:  Yes.

14           THE COURT:  If you choose to go to trial, you have

15   a right to be represented by a lawyer at that trial.  Do you

16   understand that?

17           THE DEFENDANT:  Say that again.

18           THE COURT:  Sure.  If you choose to go to trial,

19   you would have a right to be represented by a lawyer if you

20   wanted to at that trial.

21           THE DEFENDANT:  Oh, okay.  Okay.

22           THE COURT:  Do you understand that?

23           THE DEFENDANT:  Yeah.

24           THE COURT:  At a trial, you would have the right

25   to confront or have your lawyer confront and cross-examine

1   any witnesses who testified against you.  Do you understand

2   that?

3             THE DEFENDANT:  Yeah.

4             THE COURT:  You would have the right to present

5   your own witnesses at a trial if you wanted one, and you

6   would have the right to subpoena them to require them to

7   testify in your defense.  Do you understand that?

8             THE DEFENDANT:  Yes.

9             THE COURT:  At a trial, you would have the right

10  to testify and to present evidence on your behalf if you

11  wanted to, but you would not be required to testify or to

12  present any evidence if you did not want to.  That's because

13  you cannot be forced to incriminate yourself.  That means

14  you cannot be forced to present evidence of your own guilt.

15  Do you understand that?

16            THE DEFENDANT:  Yes.

17            THE COURT:  If you chose not to testify or to put

18  on any evidence, those choices could not be used against

19  you.  Do you understand that?

20            THE DEFENDANT:  Yep.

21            THE COURT:  At a trial, you would be presumed by

22  the law to be innocent, just as you are now.  That's because

23  it is the government's burden to prove your guilt, and until

24  it does that, you cannot be convicted at any trial.

25  Do you understand that?

1          THE DEFENDANT:  Yeah.

2          THE COURT:  If you went to trial and you were

3   convicted, you would have a right to appeal your conviction

4   to the Court of Appeals and to have a lawyer help you

5   prepare your appeal.  Do you understand that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Do you know what I mean by your right

8   to appeal?

9          THE DEFENDANT:  Yeah.  Take it to the next court

10  up.

11         THE COURT:  All right.

12         Now, by pleading guilty, you would be generally

13  giving up your rights to appeal.  Do you understand that?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Now, there are exceptions to that.

16  You can appeal a conviction after a guilty plea if you

17  believe that your guilty plea was somehow unlawful or

18  involuntary or if there is some other fundamental defect in

19  these guilty-plea proceedings.

20         You may also have a right to appeal your sentence

21  if you think the sentence is illegal.  Do you understand

22  those things?

23         THE DEFENDANT:  Yeah.  Pretty much.

24         THE COURT:  Now, if you plead guilty in this case

25  and I accept your guilty plea, you'll give up all of the

1    rights I just explained to you, aside from the exceptions

2    that I mentioned, because there will not be any trial, and

3    there will probably be no appeal.  Do you understand that?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Now, I mentioned that you may also

6    have a right to appeal your sentence if you think the

7    sentence is illegal.

8            You may also have a right to appeal that sentence

9    if it exceeds the Sentencing Guideline Range.

10           You could also challenge your conviction or

11    sentence based on newly discovered evidence or a claim of

12    ineffective assistance of counsel.  Do you understand those

13    things?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  Now, do you want to give up your right

16    to a trial?

17           THE DEFENDANT:  I've already signed that document.

18           THE COURT:  I guess the document you're talking

19    about is the Waiver of Trial by Jury?

20           THE DEFENDANT:  Well, the -- yeah.  The plea

21    bargain.  I already signed it.

22           MR. KRAMER:  I think he's referring to the

23    plea agreement, Your Honor.

24           THE COURT:  All right.  I have been given a

25    plea agreement that I will hold up in front of you in a

1     moment.  It is marked as Exhibit No. 3.  I'm holding that up

2     in front of you now.  Is this what you're referring to?

3               THE DEFENDANT:  Looks like it.

4               THE COURT:  Well, let me turn to the back page,

5     it's page 10, and hold that up in front of you.  Do you see

6     that page?

7               THE DEFENDANT:  Yeah.

8               THE COURT:  My finger is pointing to a signature

9     above the line marked "Rodney Class, Defendant."  Do you see

10    that?

11              THE DEFENDANT:  Correct.

12              THE COURT:  Is that your signature?

13              THE DEFENDANT:  Correct.

14              THE COURT:  You signed your name to this

15    plea agreement?

16              THE DEFENDANT:  Yeah.  I put my name on it, yeah.

17              THE COURT:  And did you do that after agreeing

18    that you would plead guilty and agree to the terms of this

19    agreement?

20              THE DEFENDANT:  We did it over at the jailhouse.

21              THE COURT:  And you signed this agreeing to what

22    the terms are in this paper?

23              THE DEFENDANT:  Yeah.

24              THE COURT:  All right.  What I wanted to make sure

25    that you could tell me, though, part of this agreement

1  suggests that you are willing to give up your right to a

2  jury trial.  Are you willing to give up your right to a jury

3  trial?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Are you willing to give up all of the

6  rights I've explained that you would have if your case went

7  to trial?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you want to give up most of your

10  rights to an appeal as well?

11          THE DEFENDANT:  Other than what you mentioned,

12  yes.

13          THE COURT:  Aside from those exceptions.

14          I'm now going to hold up what I've talked to you

15  about before, the Waiver of Trial by Jury.  It's marked as

16  Exhibit No. 1.  Do you see this document I'm holding up?

17          THE DEFENDANT:  Yes.

18          THE COURT:  My finger is pointing to a line

19  marked -- signature above the line marked, "Defendant."

20  Do you see that signature?

21          THE DEFENDANT:  Yes.  I put my name on it.

22          THE COURT:  That's your signature?

23          THE DEFENDANT:  Yes.

24          THE COURT:  All right.  And did you sign this

25  voluntarily and of your own free will?

1            THE DEFENDANT:  Yes.

2            THE COURT:  Did you sign this intending to give up

3     your right to a jury trial?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Did you mean to give up that right by

6     signing this?

7            THE DEFENDANT:  Yes.

8            THE COURT:  Do counsel know of any reason why

9     Mr. Class should not waive his right to a jury trial?

10           MR. KRAMER:  No, Your Honor.

11           MR. PEARLMAN:  No, Your Honor.

12           THE COURT:  All right.  I find that this waiver of

13    jury trial marked as Exhibit 1 is made knowingly and

14    voluntarily, and I'll accept that waiver.

15           Now, I will go back to the document you told me

16    about earlier, Mr. Class, the plea agreement.

17           Do you have your own copy of the plea agreement?

18           THE DEFENDANT:  (Indicates.)

19           THE COURT:  Are you holding up your copy of the

20    plea agreement?

21           THE DEFENDANT:  What he gave me, yeah.

22           THE COURT:  And have you carefully read it?

23           THE DEFENDANT:  I've read over it several

24    different times, yeah.

25           THE COURT:  And do you understand its terms?

1              THE DEFENDANT:  Pretty much.

2              THE COURT:  Have you discussed this plea agreement

3    with your standby lawyer?

4              THE DEFENDANT:  The what?

5              THE COURT:  Have you discussed the plea agreement

6    with your standby lawyer, Mr. Kramer?

7              THE DEFENDANT:  Just that one day.

8              THE COURT:  All right.  And does this

9    plea agreement represent the entire understanding and

10   agreement that you have with the government?

11             THE DEFENDANT:  Yeah.

12             THE COURT:  Has anybody given you any other or

13   different assurance of any kind to try to get you to plead

14   guilty in this case?

15             THE DEFENDANT:  No.

16             THE COURT:  Do you have any confusion or question

17   about the plea agreement at this point?

18             THE DEFENDANT:  No, not really.

19             THE COURT:  All right.  As I understand it, you

20   are agreeing to plead guilty to the offense of unlawful

21   carrying and having readily accessible a firearm on Capitol

22   grounds.  If I accept your guilty plea in this case, you

23   could receive a maximum sentence of up to five years in

24   prison.  You would be subject to a term of supervised

25   release of not more than three years.

1          Supervised release means that if you're sent to

2    prison, then upon your release, you would be on supervision

3    under conditions and rules with which you'd have to comply.

4    If you violate any of those conditions, you could be sent

5    back to prison for an additional period of time.

6          If you plead guilty to this charge, it could also

7    subject you to a maximum fine of $250,000, and you'd be

8    required to pay a Special Assessment of $100.  And if

9    appropriate, you may be ordered to forfeit certain property

10   to the government.

11         Mr. Class, do you understand the maximum

12   punishment you could face if you decide that you want to

13   plead guilty?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Now, there are numerous factors,

16   including complicated guidelines, that federal judges have

17   to consider in determining an appropriate sentence in a

18   criminal case.

19         A Sentencing Guidelines manual recommends specific

20   sentencing ranges for specific offenses, and your

21   criminal record, if you have one, and the nature of this

22   offense are some of the factors that may influence what your

23   recommended Sentencing Guideline Range may be.

24         A probation officer will conduct a presentence

25   investigation and submit a written report on those factors

1    and other factors to me and to the attorneys, and your

2    standby attorney will go over it with you.  Both sides'

3    attorneys will have chance to suggest changes to the report

4    or object to portions of the report.

5              At the time of sentencing -- can you hear me?

6              THE DEFENDANT:  Well, you cut out for a minute,

7    but go ahead.

8              THE COURT:  All right.

9              At the time of sentencing, I will hear from both

10   sides' attorneys, and I will determine what your recommended

11   Sentencing Guideline Range is.  Once I do that, I have to

12   consider a sentence within that recommended range, possible

13   departures from that range, and the other sentencing

14   factors.  But I can never sentence you to more than the

15   maximum punishment that I explained to you a little while

16   earlier.  Do you understand those things?

17             THE DEFENDANT:  Yeah.

18             THE COURT:  Have you and your standby counsel

19   talked about the Sentencing Guidelines and how they might

20   apply to your case?

21             THE DEFENDANT:  No.

22             (Counsel conferred with defendant off the record.)

23             THE DEFENDANT:  Oh.  All right.

24             THE COURT:  If you have your own copy of the

25   plea agreement that you read and signed, I would invite you

1   to turn to page 2 of that agreement.

2             THE DEFENDANT:  Okay.  We got it.

3             THE COURT:  Do you see near the bottom of that

4   page what's called in, numbered paragraph 4, Sentencing

5   Guidelines analysis?

6             THE DEFENDANT:  Okay.

7             THE COURT:  And then subparagraph A talks about

8   estimated offense level under the Guidelines.  Do you see

9   that?

10            THE DEFENDANT:  Yes.

11            THE COURT:  Underneath that, you see abbreviation

12  for U.S. Sentencing Guidelines and it cites certain

13  sections:  2K2.5 and 3C1.1.  Do you see that?

14            THE DEFENDANT:  Yes.

15            THE COURT:  Do you see that there's a total

16  offense level calculated, estimated to be 8?

17            THE DEFENDANT:  Okay.  Yeah.

18            THE COURT:  If you turn the page and look at

19  page 3 of the plea agreement that you've read and have in

20  front of you and go down to the paragraph --

21            MR. KRAMER:  Your Honor, I don't --

22            THE DEFENDANT:  You cut back out again.  Start

23  at -- when you went to that page 3, start over again.

24            THE COURT:  If you turn to page 3 and you go down

25  to the subparagraph that's labeled "C, Estimated applicable

1  Guidelines Range."  Do you see that?

2          THE DEFENDANT:  Yep.

3          THE COURT:  All right.

4          And then if you look at the first sentence on the

5  second line, you see an estimated Sentencing Guideline Range

6  that is spelled out in a number of months.  Do you see that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Have you and your attorney, standby

9  attorney, talked about the Sentencing Guideline Range and

10  the estimated range?

11          THE DEFENDANT:  Sort of hit and miss here.

12  We talked, but we didn't really get into a whole lot.

13          THE COURT:  Well, do you have an understanding

14  about what the estimated Sentencing Guideline Range is?

15          THE DEFENDANT:  It's supposed to be, what, zero to

16  six months?

17          THE COURT:  All right.  That's what I wanted to

18  know.

19          Now, I wanted you to know, though, that I will not

20  be able to determine the ultimate recommended Sentencing

21  Guideline Range for your case until after the presentence

22  report has been completed and after you and your standby

23  counsel and government counsel have had a chance to object

24  to any facts or conclusions that have been drawn by the

25  probation officer.  Do you understand that?

1          THE DEFENDANT:  Yeah.

2          THE COURT:  Now, indeed, the report may show, for

3   example, that your criminal record is greater than it

4   appears now or that other enhancements might apply that

5   don't appear now and that your recommended Guideline Range

6   could expose you to up to the maximum term under the statute

7   of five years, not just the six months that you heard about

8   in the plea agreement.  Do you understand that?

9          THE DEFENDANT:  Yes.

10          THE COURT:  And the sentence imposed may be higher

11   than any estimate that your attorney or the government may

12   have made, or that this agreement talks about.

13   Do you understand that?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Indeed, it could be as high as five

16   years under the statute.  Do you understand that?

17          THE DEFENDANT:  Yeah.

18          THE COURT:  Now, after I've decided what Guideline

19   Range is recommended for your case, I still have the

20   authority to impose a sentence that is more severe or less

21   severe than the sentence called for by the Sentencing

22   Guidelines.  Do you understand that?

23          THE DEFENDANT:  Yeah.

24          THE COURT:  The government may have the right,

25   just like you do, to appeal any illegal or improper sentence

1    that I impose.  Do you understand that?

2              THE DEFENDANT:  You said the government can?

3              THE COURT:  If I impose an illegal sentence, the

4    government may have a right to appeal that, just like you

5    would have the right to appeal a sentence that's illegal.

6    That's what I was trying to get you to hear.

7    Do you understand that?

8              THE DEFENDANT:  Okay.

9              THE COURT:  Do you understand that?

10             THE DEFENDANT:  Well, yeah.

11             THE COURT:  Okay.

12             Now, parole has been abolished.  And if you are

13   sentenced to prison, you will serve the sentence I impose,

14   and you will not be released early on parole as used to be

15   the case, but you may be subject to a possible reduction of

16   any prison term for good time of up to 54 days a year.

17   Do you understand that?

18             THE DEFENDANT:  Okay.

19             THE COURT:  Now, the offense to which you are

20   proposing to plead guilty is a felony offense.

21   Do you understand that?

22             THE DEFENDANT:  Yes.

23             THE COURT:  If you plead guilty and I accept your

24   plea and find you guilty of a felony, then such a finding

25   may deprive you of valuable civil rights, such as the right

1   to vote, the right to hold public office, the right to serve

2   on a jury, the right to possess any kind of firearm, and the

3   right to be free from collection of DNA samples from you.

4          THE DEFENDANT:  What's that last word?

5          THE COURT:  DNA is the abbreviation for

6   Deoxyribonucleic acid.  It means sort of body samples.

7   Have you heard of DNA before?

8          THE DEFENDANT:  Yeah.  They could take DNA at any

9   time.  I didn't understand.

10         THE COURT:  Ordinarily, if you're not convicted of

11   a felony and the government wants to take your DNA --

12         THE DEFENDANT:  Yeah.

13         THE COURT:  -- you can tell them to go pound sand.

14         THE DEFENDANT:  Okay.

15         THE COURT:  When you're convicted of a felony, the

16   government can then come to you and insist, "We want to take

17   your DNA and keep it in our records."

18         THE DEFENDANT:  Oh, all right.

19         THE COURT:  That's what I was trying to say.

20   Do you understand that?

21         THE DEFENDANT:  Oh, yeah.

22         THE COURT:  Now, under this plea agreement, you

23   are giving up your right to appeal your conviction and

24   challenge the sentence I impose, unless the sentence exceeds

25   the statutory maximum of the Guidelines Range or you claim

1    newly discovered evidence or ineffective assistance of

2    counsel.  Do you understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  If I do not accept any sentencing

5    recommendation that may have been suggested in the

6    plea agreement or ends up being made by the lawyers at

7    sentencing, you would still be bound by your guilty plea,

8    and you will not have a right to withdraw that guilty plea.

9    Do you understand that?

10             THE DEFENDANT:  Yeah.

11             THE COURT:  Has anyone at all promised to you or

12   suggested to you that I will give you a lighter sentence

13   just because you're pleading guilty?

14             THE DEFENDANT:  No.

15             THE COURT:  Has anyone made any promises to you as

16   to what sentence I will impose in this case if I accept your

17   proposed guilty plea?

18             THE DEFENDANT:  That -- what you would impose?

19   No.

20             THE COURT:  At this time, I do not know what

21   sentence I will impose in your case, because I've not yet

22   heard from the probation office or from the lawyers so far.

23   Do you understand that?

24             THE DEFENDANT:  Yep.

25             THE COURT:  Has anyone made any promises to you in

1 connection with your proposed guilty plea other than those

2 contained in this plea agreement?

3 　　　　　THE DEFENDANT:  No.

4 　　　　　THE COURT:  Is there anything that you do not

5 understand about this proceeding or about your proposed plea

6 in this case?

7 　　　　　THE DEFENDANT:  No, not really.  I pretty much got

8 my -- got an understanding what we've been doing for the

9 last 18 months.

10 　　　　　THE COURT:  Is there anything you want to ask me

11 or ask your standby lawyer before you make a decision about

12 whether you want to plead guilty or whether you want to go

13 to trial?

14 　　　　　THE DEFENDANT:  No.  Like I said, I pretty much

15 put my name on the document.  I figured that was pretty much

16 the end of it.

17 　　　　　THE COURT:  Well, I always have to make sure you

18 understand what's going on before it ends, and that's why

19 I was going through all of this.

20 　　　　　THE DEFENDANT:  Okay.

21 　　　　　THE COURT:  So are you ready now to make a

22 decision about whether you want to enter a plea of guilty or

23 whether you want to go to trial?

24 　　　　　THE DEFENDANT:  Oh, just plead guilty.

25 　　　　　THE COURT:  Are you pleading guilty voluntarily

1  and of your own free will?

2          THE DEFENDANT:  Yeah.

3          THE COURT:  Has anyone forced you or threatened

4  you or coerced you in any way into pleading guilty?

5          THE DEFENDANT:  No.

6          THE COURT:  Are you pleading guilty because you

7  are guilty and for no other reason?

8          THE DEFENDANT:  All right.  Yeah.

9          THE COURT:  Is that a yes?

10          THE DEFENDANT:  Yeah.

11          THE COURT:  All right.

12          I'm satisfied that Mr. Class is fully competent

13  and capable of making a decision today, that he understands

14  the nature and consequences of what he's doing, that he is

15  acting voluntarily and of his own free will, and there is an

16  adequate factual basis for his plea.  I, therefore, accept

17  your plea of guilty.

18          Mr. Class, if you would like to have a seat now,

19  you may have a seat.

20          I will now turn to the question I understand the

21  lawyers want to discuss with me about any conditions of

22  release.

23          If you want to stay there at the podium, you can.

24  It might be easier if you have a seat and let me hear what

25  the lawyers have to argue.  Would you like to have a seat?

1          THE DEFENDANT:  Yeah.

2          THE COURT:  You may have a seat.

3          And if at any time you can't hear the lawyers or

4   me, please let us know, okay?

5          THE DEFENDANT:  Yeah.

6          MR. KRAMER:  Thank you, Your Honor.

7          As I mentioned to Your Honor yesterday, in light

8   of the -- now that the plea is entered and in light of what

9   the parties believe, obviously, I recognize we could be

10  wrong about the Guideline Range or what Your Honor

11  determines is the Guideline Range, but we -- obviously,

12  we've been in this case for a long time, and the parties

13  think that the range is zero to six months.  And the

14  government has agreed to recommend the lower part, which is

15  obviously zero additional time, whether that be a

16  probationary sentence from here on out or time served in a

17  supervised release period from here on out.

18          Of course, that's -- none of that is binding upon

19  Your Honor.  But in light of the government's recommendation

20  that Mr. Class serve no further time, I would ask Your Honor

21  to release him pending sentencing.

22          I talked with him at length about it, and he's

23  assured me, and he's willing to assure Your Honor, that he

24  will appear for the sentencing.

25          As I mentioned last time also, there's a friend of

1   his that has been in court every time and actually was here

2   for the trial as well, who would be willing -- obviously, we

3   didn't know what Your Honor's decision on this would be and

4   we don't mean to take anything for granted.  So if

5   Your Honor was willing to release him, he would take

6   Mr. Class to his house tonight, which is in Virginia.

7   And then tomorrow, he would arrange -- he's already made

8   arrangements, if Your Honor agrees to his release, to meet

9   Mr. Class's wife down in Virginia where she would take

10  Mr. Class and immediately take him home tomorrow.

11            THE COURT:  Home to?

12            MR. KRAMER:  High Shoals, North Carolina, where he

13  was residing the entire time of the -- however long the

14  case -- while the case was pending, until the time he did

15  not appear for the trial.

16            And he is in the audience, Your Honor, and as I

17  said, willing to take him to his house tonight and then

18  ensure the transfer to Mr. Class's wife tomorrow, who would

19  then immediately take him home.

20            And, Your Honor, obviously, a travel restriction

21  to that district, it's just outside -- well, I say "just

22  outside," I think it's a half hour, 40 minutes outside of

23  Charlotte.  He was reporting to a Pretrial Services officer

24  there in Charlotte.  So that would be the district where --

25  if Your Honor -- to restrict his travel to that district and

1   report to that office in Charlotte.

2          THE COURT:  Mr. Kramer, let me ask you this.

3   Other than the comment I made yesterday, which is that

4   you've sort of promised me one-way assurance but not a

5   round-trip assurance, what other alternatives have you

6   considered?

7          And I ask this for one reason in particular.

8   My understanding is that the supervision that was provided

9   earlier while Mr. Class was under the high-intensity

10  supervision program was done as a courtesy by that district

11  in North Carolina.  My understanding is that that district

12  is unwilling to continue to extend that courtesy.

13         MR. KRAMER:  I had no idea -- this is the first

14  I've heard of that, obviously so...

15         THE COURT:  I will have to confirm whether that's

16  still the case.  But I understood that there was some point

17  before now where that district had decided it had run out

18  about all the courtesy it was prepared and willing to

19  extend.  And so I guess I'm just asking you what, if any,

20  other alternatives have you discussed?

21         MR. KRAMER:  I haven't.  And, again, I didn't even

22  know the part that earlier they had expressed.  It was

23  certainly never in any of their Pretrial Services reports

24  that were received.

25         THE COURT:  Uh-huh.

1    MR. KRAMER:  So he has a wife who, I think, we

2    actually scheduled the trial a little later because she had

3    had some surgery.  So she has some serious medical problems.

4    And so I hadn't -- if Your Honor was to release him, I mean,

5    his intent was to go back and -- obviously, he has his own

6    medical problems, but she has more serious ones.  And the

7    intent was for him to go home and take care of her until the

8    sentencing.  And then, hopefully, at the sentencing, given

9    the government's recommendation, he would be able to

10   continue to do that.  So I hadn't considered any, because

11   I had no idea there was a problem.

12       I mean, the only other thing I can suggest is that

13   he -- that Your Honor allow him to go home, and he would be

14   perfectly willing to phone in, frankly, every day to the

15   Pretrial Services office here in D.C.  That would be an

16   alternative that I could see, if they weren't willing to

17   have him even -- I'm unclear if it's just the fact of having

18   him phone in there or if it's -- it was the ankle bracelet

19   that they were -- because that --

20       THE COURT:  Well --

21       MR. KRAMER:  -- of the supervision.  I don't know

22   which part they weren't willing to continue or the entire

23   part.

24       THE COURT:  I'm not sure that I parsed out or

25   understood that there was a parsing out.

1          The high-intensity supervision program generally

2     requires a number of things:  Wearing the ankle bracelet,

3     making home visits to assure that there were no weapons,

4     contact of some kind, potentially calls.  I think it may

5     have involved some or all of those issues that posed

6     problems for that district's supervision.

7          MR. KRAMER:  I know that it -- the Classes have

8     very little money, and I know that at some point Your Honor

9     lowered the amount of money they were responsible for on

10    the -- from $100 to $50 a month, and even that was

11    stretching them.  And I don't know if that entered into also

12    the North Carolina not wanting to supervise him anymore

13    since they weren't paying the full expense of that

14    supervision too.  So if that was the case, I mean, it's just

15    that they don't have the money, frankly.

16          THE COURT:  I don't know anything about that, but

17    I probably want to hear from you all about other

18    alternatives, given what I understand to be a difficulty

19    with that district continuing to agree to supervision as a

20    courtesy.

21          Part of the other -- your argument is that we face

22    a circumstance where the Guidelines are zero to six.

23    If that's true, government is presumably going to come in

24    and ask for zero, if it ends up being zero to six; and it

25    would call into the wisdom of Mr. Class remaining in D.C. in

1    custody, all valid arguments.

2           One principal concern, obviously, is that

3    I don't know yet about the round-trip promise.  I'd want to

4    see if there's a circumstance that would build in some

5    incentive for that round trip.  You mentioned a gentleman

6    who was kind enough to come and be present and to transport

7    Mr. Class at least back to Virginia for one night.

8    That gave me the thought of having some kind of an unsecured

9    promissory bond that would subject the gentleman to some

10   kind of monetary forfeiture should Mr. Class not return.

11   Alternatively, a release into the -- or, in addition,

12   alternatively, released into the custody of the

13   gentleman's -- into the custody of the gentleman to stay up

14   here until we have to return.

15          So I'm just generating thoughts about what

16   potential alternatives there might be and that might be

17   worthy of pursuit.

18          MR. KRAMER:  Could I have a moment to talk to him,

19   Your Honor?

20          THE COURT:  Absolutely.

21          MR. KRAMER:  Thank you.

22          THE COURT:  Both to Mr. Class and the gentleman

23   who was kind enough to show up.

24          (Counsel conferred with defendant off the record.)

25          MR. KRAMER:  Your Honor, I talked to -- his name

1    is Robert Hoff, H-o-f-f.  He is willing to sign a surety

2    bond.  He did -- I mentioned the figure of $1,000 as a

3    possibility.  He said he would be perfectly willing to sign

4    a surety bond for that amount of money for Mr. -- to ensure

5    Mr. Class's appearance.

6            And I know that Mr. Class is prepared -- and I

7    understand Your Honor's trepidation, but I know that he's

8    willing to give Your Honor his word.  I asked him

9    specifically about it, that he will show up for the

10   sentencing.

11           THE COURT:  All right.  Thank you.

12           Mr. Pearlman.

13           MR. PEARLMAN:  I guess Your Honor had discussions

14   with the Pretrial officer.  Is there any more information

15   Your Honor can provide about what the view of the Pretrial

16   office down in North Carolina actually is?

17           THE COURT:  There is, and I'll expect to call them

18   up, but I'd be happy to hear your view.

19           MR. PEARLMAN:  What?

20           THE COURT:  Yes, there is.  I'll be calling him

21   up, but I'm asking you for your views about conditions of

22   release, if any.

23           MR. PEARLMAN:  I'm asking for the same conditions

24   that -- I don't oppose him being released from the D.C. jail

25   and being returned in a quick manner to his home in North

1   Carolina.

2          I would ask for the same conditions that he had

3   when he was awaiting trial in October, which would include

4   the ankle bracelet, but I don't know if that's possible or

5   not.

6          THE COURT:  All right.  Thank you.

7          I will invite the Pretrial Services officer to

8   come forward and update us on anything you know.

9          PRETRIAL SERVICES:  Definitely, Your Honor.

10  Thank you again.  This is Vaughn Wilson with Pretrial

11  Services.

12         As the Court is aware, we made numerous calls to

13  the Western District of North Carolina to -- I'm sorry --

14  I'm sorry -- to ascertain if they would accept the defendant

15  back on courtesy supervision.  They were unwilling to do so

16  at a certain point, with some assertion they were -- they

17  said they would consider placing him back on GPS, and so

18  that's where we are right now.

19         They want Mr. Class to know that, as part of your

20  conditions of release, you will maintain the GPS bracelet.

21  There will also be numerous home visits.  And they would

22  like for you to comply when there is an officer at your

23  home.  And if you're required to come in for any visit, that

24  you are readily available to comply with those conditions of

25  release.

1          From what I understand, it was a bit frustrating

2    in the beginning to try to have Mr. Class comply.  When they

3    went to the home, it was a bit frustrating.  He didn't seem

4    too enthused about them being here.

5          So that was one of their issues with placing him

6    back on electronic monitoring.  But they agreed to do so,

7    Your Honor, with other conditions as well, and I believe you

8    do have the order, Your Honor.

9          THE COURT:  All right.  Thank you very much.

10   I appreciate it.

11         What I'm going to do is do two things.  I'm going

12   to grant the request that Mr. Class be released, and I'm

13   going to do so under the following conditions:  I'm going to

14   reinstate the conditions that are imposed under the

15   high-intensity supervision program.  He will have to report

16   as directed to the United States Pretrial Services Agency

17   for the Western District of North Carolina, and live at the

18   address provided earlier in the case.  He will be prohibited

19   from possessing any firearms or destructive devices or other

20   weapons.  And any firearms have to be surrendered within 24

21   hours of his return to North Carolina.

22         He's to stay in North Carolina unless he comes up

23   to D.C. for court matters.  And he's to stay outside of the

24   District of Columbia, unless he's ordered to be back here.

25         He will be required to have the ankle bracelet

1   placed back on him and be subject to GPS location

2   monitoring, and pay amounts anywhere from 50 to $100 for

3   that monitoring, as he's able to, and comply with any

4   request from the Pretrial Services office for a list of any

5   weapons that he may have.

6          I'll also impose an unsecured surety bond upon the

7   gentleman who was kind enough to come up to agree to take

8   you back to Virginia and assure your return to

9   North Carolina.  And I assume he's also, or someone will be,

10  assuring that you're back here for sentencing.

11         I'll also hear from you, if you wish to say

12  anything more, Mr. Class, and we will set a date for that

13  sentencing in just a moment.

14         But having announced what those conditions are, if

15  you wanted to respond in any way, I'll let you do that now.

16  If you don't want to say anything, that's fine as well.

17         THE DEFENDANT:  All right.  I'll just sit still.

18         THE COURT:  All right.

19         But just a word from this bench.

20         The Pretrial Services officers have an obligation.

21  If they come to the house and they have to do the job just

22  to check on you and to check on weapons and so forth, you

23  don't want to get in any trouble, just let them come in and

24  let them do their job.  Everything will be fine until you

25  come back up here.

1           THE DEFENDANT:  (Raised hand.)

2           THE COURT:  Yes, sir.

3           THE DEFENDANT:  Oh, I never had any problem with

4   Jarold Patton.  He's always welcome in the house; he's

5   walked up through.  I've always called him on Wednesday at

6   about 9:00 in the morning.  So I never had any problems with

7   him.

8           The only thing that we may have had is the monitor

9   may have got jiggled because my wife, being wobbly, bumped

10  up against where we were sitting at, or my granddaughter

11  playing, bumping up against it.  Other than that,

12  I don't know whatever issues we had.

13          THE COURT:  Well, I'll take you at your word, but

14  you'll probably have a different officer supervising you

15  this time.  And whoever that is, just let the officer do his

16  or her job, and you'll be fine.  It sounds like that office

17  had a different view from the view you have, but you got a

18  new shot.

19          As long as you do what you're supposed to do and

20  you comply with these conditions and you let the Pretrial

21  Services officers do what they have to do, you'll be fine,

22  because you don't want to be back in a situation where we

23  have to issue another warrant for you to bring you back up

24  here in chains.  I don't want that, you don't want that, I'm

25  sure your wife doesn't want that.

1          THE DEFENDANT:  No.

2          THE COURT:  So let everybody do what they have to

3    do, comply with the conditions, and we'll be back here fine.

4          THE DEFENDANT:  All right.  No problem.

5          THE COURT:  All right.  You can have a seat.

6          Counsel, let me ask you all to come up and we'll

7    do some scheduling.

8          What I'd like to do is to schedule sentencing for

9    February 4th, order a presentence investigation, where we'll

10   have a final one due by January 23rd, and a deadline for all

11   sentencing memos and other motions due by January 30th.

12   How does that work for you all?

13          MR. PEARLMAN:  That's fine for the government.

14   Is that a Monday?

15          THE COURT:  The 9th of February.

16          MR. KRAMER:  Did you say the 4th of February?

17   I'm sorry.  Did you say the 4th or the 9th?

18          THE COURT:  I meant to say the 9th, if I said the

19   4th, but that is a Monday.

20          MR. KRAMER:  The 9th is fine, I'm sorry.  Yeah,

21   I thought it was the prior week.  The 9th is perfect.

22   Thank you.

23          MR. PEARLMAN:  What time on the 9th?

24          THE COURT:  10 a.m.?

25          MR. PEARLMAN:  Thank you, Your Honor.

1          THE COURT:  All right.  We'll schedule sentencing

2     for February the 9th, 2015, at 10:00 a.m.

3          I'll order a presentence report -- presentence

4     investigation, with a final report due on January 23rd, and

5     any motions to be filed will have to be filed by

6     January 30th, all of those in the year of 2015.

7          We'll order conditions of release under the High

8     Intensity Supervision Program.

9          I'll also order that an unsecured surety bond be

10    imposed in the amount of $1,000, naming --

11         MR. KRAMER:  Robert H-o-f-f, Hoff.

12         THE COURT:  -- Mr. Robert Hoff.  And we'll have to

13    have him come forward to execute that as well.

14         Mr. Smith.

15         (Pause)

16         MR. KRAMER:  And, Your Honor, just -- I think

17    Your Honor indicated it was okay, but I just want to check

18    and make sure that, tonight and into tomorrow, he can stay

19    in the District of Virginia, Eastern District of Virginia

20    until he meets his wife.  And then by tomorrow, he'll be

21    back home.

22         I know Your Honor had ordered to keep -- I mean,

23    ordered that he be in the, I guess, that's the Western

24    District of North Carolina.  But at least for tonight and

25    tomorrow.

1          THE COURT:  Yes.  I'll allow that period for

2  transport between here and North Carolina.

3          MR. KRAMER:  Thank you.

4          Is that it for Mr. Hoff, Your Honor?

5          THE COURT:  As soon as I look at the form, it may

6  be.

7          DEPUTY CLERK:  Mr. Class.

8          THE COURT:  Thank you, Mr. Hoff.

9          DEPUTY CLERK:  Mr. Class, would you stand, please.

10  Step forward and raise your right hand.

11          Raise your right hand, please.

12          (Defendant is placed under oath.)

13          DEPUTY CLERK:  Thank you.

14          THE COURT:  All right.  Mr. Class, you are due

15  back in court, as it indicated on that form, on

16  February 9th, 2015, at 10:00 a.m.  If you fail to appear as

17  required, it's a separate criminal offense for which you

18  could be prosecuted and sentenced to imprisonment.  All of

19  the conditions on which you're being released continue to

20  apply until that time, and penalties for violating those

21  conditions can be severe.

22          If you commit any crime while you're on release,

23  it could subject you to more severe punishment than you

24  would have received for that crime if you had not been under

25  release conditions.  Do you understand those things?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Counsel, anything further we need to

3   take up?

4          MR. KRAMER:  No, Your Honor.

5          THE COURT:  Anything further?

6          MR. PEARLMAN:  No, Your Honor.

7          THE COURT:  All right.  Thank you very much, and

8   you may be excused.  We'll see you back in February.

9          THE DEFENDANT:  Okay.

10          THE COURT:  All right.

11          (Proceedings concluded at 3:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: October 28, 2015_____   /S/__William P. Zaremba_____

                                William P. Zaremba, RMR, CRR